UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BLOOM HOTELS 6060, LLC,

Debtor.

_____/

Case No.      26-11867-RAM

Chapter 11

**DE PAZ FAMILY INVESTMENT, LLC'S RESPONSE TO DEBTOR'S *EXPEDITED*
MOTION FOR INTERIM AND FINAL ORDERS APPROVING DEBTOR-IN-
POSSESSION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364,
GRANTING RELATED RELIEF, AND SETTING FINAL HEARING**

De Paz Family Investment, LLC ("DPFI" or "De Paz"), a secured creditor in this bankruptcy case, files its Response to Debtor's Expedited Motion for Interim and Final Orders Approving Debtor-In-Possession Financing Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364, Granting Related Relief, and Setting Final Hearing (DE 78) ("Motion"), and states as follows:

**PRELIMINARY STATEMENT**

DPFI is a secured creditor whose foreclosure sale was stayed one day before it was scheduled to occur. Now, more than five months into this bankruptcy, the Debtor seeks authority to borrow up to $2.545 million in priming DIP financing—not to preserve its sole asset, but to demolish portions of it without any plan to restore them and to fund nearly $500,000 in professional fees that do nothing to protect De Paz's collateral.

The Debtor has had ample opportunity to demonstrate a viable path to reorganization. It has squandered that opportunity. The Debtor has cycled through three fundamentally different redevelopment strategies, missed its self-imposed June 2026 plan-filing deadline, and failed to produce the "equity partner" who was supposedly going to "pay off the full amount of DPFI's claim." Meanwhile, the Debtor has generated zero revenue, holds minimal cash, and now seeks to

1

prime De Paz's approximately $24.7 million secured claim based on a stale appraisal that does not account for the very demolition the Debtor proposes.

The proposed DIP financing fails to satisfy Section 364(d)'s requirements. The Debtor has not demonstrated that it cannot obtain credit otherwise—and refused to make its corporate representative available for deposition to allow De Paz to probe what alternatives were explored. There is no adequate protection: the $38 million appraisal was never tested against a "post-demolition" scenario, and nearly one-fifth of the borrowed funds are earmarked for professional fees rather than asset preservation. The Court should deny the Motion.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND AND FACTS

**I.      Debtor and the Property**

2.      Debtor owns a single piece of real property—a condominium-hotel building at 6060 Indian Creek Drive, Miami Beach, Florida ("Property").

3.      The Property is a 15-story condominium-hotel building containing eighty-seven units, situated on approximately 27,424 square feet at Lots 31 through 35, Block 2, Amended Plat of 2 Ocean Front Subdivision. Debtor acquired the Property on February 3, 2022, for $23.5 million.

4.      The Property is currently vacant and has an appraised "As Is" Market Value of $38,000,000. Critically, however, the $38,000,000 appraisal was prepared before any proposed demolition of individual hotel units and was never tested against a "post-demolition" or "as-demolished" scenario.

ACTIVE:40085995.1

5.      The Property is Debtor's only significant asset. No substantial business is conducted on the Property other than non-revenue generating operations incidental to ownership.

## II.      The State Court Foreclosure Action and the Bankruptcy

6.      De Paz is the plaintiff in De Paz Family Investment, LLC v. Bloom Hotels 6060, LLC, et al., Case No. 25-012347-CA-01 ("State Court Action"), a mortgage foreclosure action pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. A foreclosure sale was scheduled for February 17, 2026, at 9:00 a.m.

7.      On February 16, 2026, one day before the scheduled foreclosure sale, Debtor filed a voluntary Chapter 11 petition commencing Case No. 26-11867 ("Bankruptcy Case").

8.      The filing triggered the automatic stay under 11 U.S.C. § 362(a), staying both the State Court Action and the foreclosure sale.

9.      That same day, Debtor filed a Suggestion of Bankruptcy and Notice of Automatic Stay in the State Court Action, requesting abatement or administrative closure.

10.      On March 2, 2026, Debtor filed its Schedules with the Court. Schedule A makes clear that outside of some inventory, the Property is Debtor's sole asset. (DE 17, Sch. A).

11.      Further, Form 207 also makes clear that Debtor has had no business revenue for 2026, 2025, or 2024. (Id., Form 207).

12.      In over five months since the Debtor filed for bankruptcy, the Debtor has (a) generated $0 in cash receipts for the period ending April 30, 2026 (DE 70); (b) reported only $2,986 cash on hand as of May 31, 2026 (DE 75); and (c) cycled through three fundamentally different redevelopment strategies over 120+ days (full demolition/rebuild under the "Live Local" Act; reopening as a branded hotel; and ultimately a condo-hotel/studio-condominium conversion).

ACTIVE:40085995.1

13. In connection with the Court's hearing on DPFI's SARE Motion (DE 51), Debtor represented that Bloom Hotels would file a plan of reorganization "by the end of June, 2026." Debtor also represented, in connection with an earlier $3.5 million financing concept, that Debtor would have "an equity partner who will put up sufficient funds to pay off the $3.5 million loan and the full amount of DPFI's claim."

14. None of this has materialized. That deadline passed without a plan. Instead, the Debtor filed yet another motion seeking another 60-day extension of time to file its plan. Further, the Court expressly observed at that hearing that a request to prime DPFI "was going to be very difficult for them to be able to do" and noted that if DPFI is owed roughly $25 million and a new lender is owed $3.5 million (roughly $30 million in the aggregate), "there is more risk of non-payment in full than the Debtor acknowledged, given the $38 million valuation."

III. **The Motion**

15. Since failing to honor their commitments, the Debtor filed the Motion. Prior to filing the Motion, the Debtor did not meaningfully confer with DPFI or share the terms of the proposed DIP Financing with DPFI.

16. While the Debtor characterizes the Motion as an emergency, any urgency here is self-created. The Debtor has owned this Property since well before the petition date. The code violations have been pending since at least 2016 (as evidenced by the case numbers on the DIP Budget, e.g., BV16000711). The Debtor has had more than three years to address these violations and over five months post-petition to formalize a plan. It did neither.

17. Upon review, the DIP Loan includes terms that are not beneficial to the estate. For example, the proposed DIP Loan imposes: a 12.50% contract interest rate (17.50% upon default); a 4% commitment fee; a 4% stand-by fee (if triggered); a 1% servicing fee; a $25,000 non-debtor-

4

funds application fee; a $25,000 deferred fee; a § 506(c) surcharge waiver; a "dirt-for-debt" prohibition; and default remedies limited to a 10-business-day cure period and a 48-hour shortened notice period for stay relief.

18. Upon filing of the Motion, DPFI sought to depose the Debtor's corporate representative prior to the hearing on the Motion to explore, among other things, the Debtor's efforts to obtain alternative financing. The Debtor refused to make its representative available.

19. In addition to the unfavorable terms set forth above, below are some of the largest problems with the proposed usage of the funds to be received from the DIP Loan.

20. **First**, the Debtor alleges, without explanation or support, that "$517,000.00 in borrowing will eliminate $2,530,488.55 in City Liens" from the City of Miami Beach. That is not correct. Based on the Motion, the $517,000 in DIP Financing will be used to allegedly cure the violations on a move-forward basis. But curing a violation on a move-forward basis does not extinguish the accrued fines in place for the historical violation. To that point, the Debtor does not make any allegation or provide any support that the already-existing debt owed to the City of Miami Beach will be extinguished or resolved by virtue of the proposed cure of the violation. Rather, the Debtor makes clear that it will "confer with counsel for the City of Miami Beach prior to the Interim Hearing," merely noting in conclusory fashion that "their economic rights in the Property are being benefited and not adversely affected."

21. The Debtor will ultimately have to provide evidence, such as a written statement, that the City of Miami Beach has reduced the lien to a liquidated amount. Unless the City of Miami Beach has agreed to a liquidated amount, the Debtor cannot state with absolute certainty how much it will need to borrow. If the Debtor has been, or continues to be meeting with the City of Miami Beach, this information should be provided as well since the Debtor is not communicating any of

5

this information to DPFI.  If there has been a hearing before a magistrate or other official to determine the liquidated amount and to approve a mitigation plan, or if there has not been a hearing but a hearing is required, then that must be disclosed as well. The creditors should not be forced to guess at the status of the relationship between the Debtor and the City of Miami Beach.

22.     *Second*, the Debtor argues that it "seeks to use the proceeds of the DIP Financing, pursuant to the DIP Financing Budgets, primarily to de-risk, stabilize, and enhance the value of the Property and to strengthen the Debtor's estate to improve its reorganization position." Yet the Debtor proposes to demolish 10 units at the Property, with no budget to repair the units in question. In other words, the Debtor is substantially altering DPFI's collateral, and has not provided any evidence regarding the post-demolition condition of the Property or what its value would be. And while the Debtor says the Property "will be substantially renovated in the near term," the question must be asked: When? And with what money? The Debtor has no operations, no income, and no real assets. These are basic questions that the Debtor has failed to answer, but that have significant impact on whether the DIP Loan is feasible.

23.     *Third*, and most egregiously, the Debtor proposes to take out a priming loan for hundreds of thousands of dollars (including between $425,000 and $500,000) for administrative expenses (such as counsel fees). Indeed, nearly one-fifth of the borrowed (priming) funds are diverted to professional fees—funds that do nothing to preserve DPFI's collateral and, if anything, fund the Debtor's litigation posture against DPFI.

24.     Most importantly, the Debtor has shown negligible progress toward reorganization. The Debtor has cycled through three fundamentally different redevelopment strategies, and has failed at each turn. The Debtor has never produced concrete, binding equity or refinancing commitments. It references only "advanced negotiations," characterizes matters as being in their

6

"final stages," and has a documented track record of unmet promises—from the "equity partner" who would "pay off the full amount of DPFI's claim" (never materialized) to the June 2026 plan-filing deadline (missed). There is no demonstrated ability to actually pay DPFI's claim even if the DIP financing and demolition were to proceed.

## REQUESTED RELIEF

25.    DPFI respectfully requests that this Court enter an order denying the Motion. Alternatively, to the extent the Court grants the Motion, DPFI requests that the Court only grant DIP Financing on issues related to the cure of the City Liens and the Property Tax Liens in a way that does not impair DPFI's collateral (which, for avoidance of all doubt, does not include the professional carve-out fees).

## ARGUMENT

26.    Section 364(d) of the Bankruptcy Code permits a court to authorize a debtor to obtain credit secured by a senior or equal lien on property already subject to a lien only if two conditions are satisfied: (1) the debtor is unable to obtain such credit otherwise; and (2) there is adequate protection of the interest of the existing lienholder. 11 U.S.C. § 364(d)(1).

27.    "As a general principle, the Bankruptcy Code recognizes the primacy of pre-petition contractual liens and seeks to preserve the financial interests created thereby." *In re Mosello,* 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996). "This policy is recognized by § 364(d) which permits the priming of an existing lien only as 'a last resort.'" *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 890 (Bankr. E.D. Pa. 2007) (quoting *In the Matter of Qualitech Steel Corp.,* 276 F.3d 245, 248 (7th Cir.2001); *In re Seth Co.,* 281 B.R. 150, 153 (Bankr.D.Conn.2002) ("ability to prime is extraordinary"). Indeed, "the § 364(d) process is considered rare and extraordinary, which is why the trustee or debtor in possession must establish an inability to obtain the necessary credit

7

by any method other than having such credit secured by a senior or equal lien on previously encumbered property." *In re Westport Holdings Tampa, Ltd. P'ship*, 607 B.R. 715, 725 (M.D. Fla. 2019). "Given the consequences to the existing creditor of a priming lien, the court must be 'particularly cautious' when evaluating whether the subordinated creditor is adequately protected." *In re Stoney Creek Techs., LLC*, 364 B.R. at 890. The Debtor fails to meet this burden here for several reasons.

28.    *First*, the Debtor has failed to demonstrate that it cannot obtain credit otherwise. The Debtor has not demonstrated—nor even alleged—that it attempted to obtain unsecured credit, administrative expense priority financing, or junior lien financing before seeking to prime DPFI. Courts require debtors to make meaningful efforts to satisfy this burden. *E.g.*, *Suntrust Bank v. Den-Mark Constr., Inc. (In re Den-Mark Constr., Inc.)*, 406 B.R. 683, 689–92 (E.D.N.C. 2009) (finding an inadequate showing of inability to obtain financing on less onerous terms where debtors failed to identify any of the unreceptive alternative sources they approached and noting "[t]he first prong of § 364(d)(1) requires the debtor **affirmatively** to demonstrate, **not merely assume**, that less onerous post-petition financing was unavailable"). The Debtor's refusal to make its corporate representative available for deposition prior to this hearing compounds the problem: DPFI has been denied the opportunity to probe what financing alternatives the Debtor explored, what lenders it approached, and why those alternatives were purportedly unavailable. Without such discovery, and without any showing by the Debtor, the Court cannot find that the Debtor satisfied its burden under Section 364(d)(1)(A).

29.    *Second*, there is no adequate protection to DPFI. Adequate protection is "generally fashioned as appropriate, on a case-by-case basis, to protect the existing lienholder from any diminution in the value of its collateral as a result of the grant of a lien under section 364." 3 Collier

8

on Bankruptcy ¶ 364.05[1] (16th ed. 2026). Critically, "[w]hether the existing lender's interest is adequately protected by a sufficient equity cushion turns on the valuation of the collateral, the method for which may take into account the intended disposition of the collateral." *Id.*

30.    To begin, the valuation proposed by Debtor is stale and does not account for the impact of the demolition work to be done. Courts have denied priming liens where valuations are speculative or do not account for proposed changes. *See In re Tempe Land Co., LLC*, 2009 Bankr. LEXIS 1137, at *4–7 (Bankr. D. Ariz. May 1, 2009) (predictions of future success of unfinished construction project were uncertain and insufficient to provide adequate protection). The $38,000,000 "As Is" appraisal that the Debtor relies upon was prepared before any proposed demolition of individual hotel units. The Debtor now proposes to demolish 10 units without providing any evidence of what the Property would be worth in a "post-demolition" or "as-demolished" condition. The Debtor has not established—or even attempted to establish—how tearing out these units, without any corresponding budget to restore them, will affect the Property's market value. DPFI cannot be deemed "adequately protected" when the very collateral securing its claim is being materially altered based on a valuation that does not account for the proposed changes.

31.    What's more, there is no clear path to repay DPFI, and the case has made negligible, at best, progress. Despite more than five months in bankruptcy, the Debtor has failed to propose a viable path to repay DPFI's approximately $24.7 million secured claim. The Debtor has cycled through three fundamentally different redevelopment strategies—full demolition/rebuild under the "Live Local" Act, reopening as a branded hotel, and ultimately a condo-hotel/studio-condominium conversion—without producing concrete, binding equity or refinancing commitments. The Debtor missed its self-imposed June 2026 plan-filing deadline and has instead sought yet another 60-day

ACTIVE:40085995.1

extension. The "equity partner" who was supposedly going to "pay off the full amount of DPFI's claim" has never materialized. As Collier explains, "[w]hen the effect of the new borrowing from a senior lender is merely to pass the risk of loss to the holder of the prepetition lien, the request for authorization should be denied absent the lien holder's consent. The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the prepetition lender in order to provide additional protection for a new, postpetition lender." 3 Collier on Bankruptcy ¶ 364.05[1] (16th ed. 2026). With no demonstrated ability to actually repay DPFI's claim (plus accruing 8.65% interest), the Court should not authorize priming DIP financing that further subordinates DPFI's position while offering no realistic prospect of repayment.

32.      **_Finally_**, the professional carve-out fee is not requested in good faith and does not benefit the estate. Nearly one-fifth of the proposed DIP financing—between $425,000 and $500,000—is earmarked for professional fees rather than preserving the estate's assets or remedying code violations. These funds do nothing to protect or enhance DPFI's collateral. If anything, the professional fee carve-out funds the Debtor's litigation posture against DPFI rather than advancing any legitimate reorganization purpose. The burden of proving adequate protection "is on the trustee," and "[a] finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis." _In re Mosello_, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996); _see also_ 3 Collier on Bankruptcy ¶ 364.05[1] (16th ed. 2026). Approving a priming lien to pay administrative expenses that do not benefit the estate or adequately protect the secured creditor is inconsistent with Section 364(d)'s requirements and the Bankruptcy Code's fundamental protection of pre-petition lien holders.

10

## **CONCLUSION**

**WHEREFORE**, De Paz Family Investment, LLC respectfully requests that this Court enter an Order: (a) Denying the Motion in its entirety; (b) Alternatively, if the Court is inclined to grant DIP financing, limiting such financing solely to the cure of City Liens and Property Tax Liens in a manner that does not impair De Paz's collateral, excluding any professional fee carve-out, and requiring the Debtor to provide a post-demolition appraisal and a budget for restoration of the demolished units before any demolition proceeds and for the payment of the professional fees and costs of counsel for De Paz Family Investment, LLC; (c) Reserving De Paz's right to seek relief from the automatic stay pursuant to 11 U.S.C. § 362(d) if the DIP financing is approved and the Debtor fails to demonstrate adequate progress toward a confirmable plan of reorganization; and (d) Granting such other and further relief as this Court deems just and proper.

Dated: July 22, 2026,

Respectfully Submitted,

**GUNSTER, YOAKLEY & STEWART, P.A.**

*/s/ Kenneth G.M. Mather*
**Kenneth G.M. Mather, Esq.**
Florida Bar No.:  619647
**Michael B. Green, Esq.**
Florida Bar No.: 87571
401 E. Jackson Street, Suite 1500
Tampa, FL  33602
(813)222-6630
Primary E-mails:          kmather@gunster.com,
                                        mgreen@gunster.com
Secondary E-mails:      jcowzer@gunster.com,
                                        tsimmons@gunster.com

*Attorneys for De Paz Family Investment LLC*

11

ACTIVE:40085995.1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of the United States Bankruptcy Court for the Southern District of Florida via the CM/ECF document filing system, which will serve a true and correct copy on all counsel of record registered to receive such service, and sent via regular U.S. Mail to Debtor, Bloom Hotels 6060, LLC, 2937 SW 27 Ave #201, Coconut Grove, FL 33134; Debtor's Counsel, Kristopher Pearson, 1000 Brickell Ave., Ste. 1020, Miami, FL 33131; the U.S. Trustee's Office, 51 S.W. 1st Ave., Suite 1204, Miami, FL 33130; and to all parties on the attached mailing matrix, on this 22nd day of July 2026.

*/s/ Kenneth G.M. Mather*
Kenneth G.M. Mather, Esq.

12

ACTIVE:40085995.1